Filed 12/22/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALFREDO RAMIREZ,<br><br>    Defendant and Appellant. | H049957<br>(Monterey County<br> Super. Ct. No. 18CR008098) |

## I. INTRODUCTION

A jury found defendant Alfredo Ramirez guilty of three counts of lewd or lascivious acts upon child Jane Doe 1 (Pen. Code, § 288, subd. (a); counts 1–3),[1] three counts of using minor Jane Doe 1 for sex acts (§ 311.4, subd. (c); counts 4–6), one count of possession of matter depicting a minor engaging in sexual conduct (§ 311.11, subd. (a); count 7), one count of a lewd or lascivious act upon child Jane Doe 2 (§ 288, subd. (a); count 8), one count of a lewd or lascivious act upon child Jane Doe 3 (§ 288, subd. (a); count 9), and two counts of lewd or lascivious acts upon child Jane Doe 4 (§ 288, subd. (a); counts 10–11). With regard to each of the lewd or lascivious acts upon a child counts, the jury found true enhancements for committing the offenses against multiple victims (§§ 667.61, subds. (b) & (e)(4), 1203.066, subd. (a)(7)). The trial court sentenced defendant to a total term of 107 years to life in prison. The trial court also imposed various fines and fees, including a $10,000 restitution fine pursuant to

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

section 1202.4, subdivision (b), and a suspended parole revocation restitution fine in the same amount pursuant to section 1202.45.

On appeal, defendant raises nine claims of error: (1) the compelled use of his fingerprint to unlock his phone constituted an unreasonable search under the Fourth Amendment to the United States Constitution; (2) the compelled use of his fingerprint to unlock his phone violated his privilege against compulsory self-incrimination under the Fifth Amendment to the United States Constitution and under the California Constitution; (3) the compelled use of his fingerprint to unlock his phone violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and under the California Constitution; (4) if the first three issues were not properly preserved for appeal, he received constitutionally ineffective assistance of counsel; (5) the trial court erred in admitting expert testimony concerning child sexual abuse victims' responses; (6) the trial court erroneously instructed the jury that behaviors of child sexual abuse victims could be considered to evaluate the credibility of the complaining witnesses, depriving defendant of his right to due process; (7) the trial court violated his due process right by instructing the jury that it could use proof of any charged offense to infer defendant was predisposed to commit the other charged offenses; (8) he received constitutionally ineffective assistance of counsel when his trial counsel failed to object to a comment by the prosecutor in closing argument that the jury should not consider lesser included offenses on two counts until it first found defendant was not guilty of the charged offenses; and (9) his due process right was violated by the imposition of certain fines and fees without a determination that he was able to pay those costs.

For reasons that we will explain, we will affirm the judgment.

2

## II. BACKGROUND

### A. *Jane Does 2, 3, and 4*

When defendant was in high school, he began dating a 15-year-old girl, M. M. was one of 12 children in her family. M. became pregnant and gave birth to a daughter at age 15, and she married defendant. At least three of M.'s younger sisters – Jane Does 2, 3, and 4 – would regularly sleep over at the home of defendant, M., and the couple's daughter. The sleepovers were defendant's idea. M.'s brothers would not sleep over at defendant's house. Defendant also took Jane Does 2, 3, and 4 to various activities, including swimming pools, amusement parks, and a boardwalk. M.'s brothers generally did not come to these activities.

According to Jane Doe 2's testimony at defendant's trial, defendant once came into the room where she was sleeping during a sleepover and tugged at her blanket, scaring her. Jane Doe 2, who was between age 11 and age 13 at the time, falsely told defendant her stomach hurt and defendant left the room. Jane Doe 2, who described herself as a heavy sleeper, testified that every time she slept at defendant's home, she would wake up in the morning to find her pants undone, something that did not happen when she slept elsewhere. Jane Doe 2 also testified that when she was about 13 years old, defendant took her and her sisters to the pool, and took her to buy a swimsuit beforehand. Defendant bought Jane Doe 2 a bikini, encouraging her to choose a bikini and telling her that she would not be able to wear one when she was older. Jane Doe 2 testified that when they went to the pool after this, defendant repeatedly threw her up in the air while they were in the pool, each time lifting her top and touching her breasts as she came back down into the water. Jane Doe 2 reported these incidents to her mother and to police in 1996.

Jane Doe 3 testified that she "hated" going to sleepovers at defendant's house "[b]ecause I knew that he would try to sneak in the room or sneak next to us." She testified that she noticed one morning of a sleepover that the straps of her overalls were

off. Jane Doe 3 testified that "[p]robably every time I spent the night at their house," defendant would come into their room in the middle of the night, and Jane Doe 3 would try to protect her sisters by waking them up. She recalled one time when during the night, defendant touched the bare skin on her leg from her calf to her thighs, scaring her. She was about 11 years old when this occurred. As with Jane Doe 2, Jane Doe 3 reported this information to her mother and to police in 1996.

Jane Doe 4 was the youngest of the sisters and took part in sleepovers at defendant's house from about age seven to age nine. She testified that she generally wore nightgowns during the sleepovers at defendant's request. However, she testified that her sisters both wore overalls at night and they would find the overalls unbuckled in the morning. She testified that defendant would come into the room during the night. She testified that this scared her, because defendant came into the room seven or eight times and touched her on her vagina with his hand, with skin-on-skin contact. She also testified that defendant would touch her buttocks through her clothes while she slept over at his house, and that this happened "[m]ore than twice." Like her sisters, Jane Doe 4 told her mother about defendant's actions and then reported defendant's actions to police in 1996. Police did not refer the matter for prosecution.

When the girls reported defendant's actions to police, defendant called the girls' mother that same day, asking her who reported him to police. The girls' mother testified that defendant told her, "You need to drop everything," and that the police report would harm his marriage to M. The girls' mother also testified that defendant also "desperately pleaded" that if the matter were dropped, he would move out of town.

**B. *Jane Doe 1***

Defendant and M.'s marriage ended at some point after this. Later, in the time leading up to August 2018, defendant's cousin's daughter, Jane Doe 1, would have sleepovers with another daughter defendant later had with another woman, with the sleepovers taking place at defendant's house. On August 5, 2018, Jane Doe 1 reported to

her mother that she did not want to sleep over at defendant's house again because defendant was "weird." When the girl's mother asked her what she meant, Jane Doe 1 reported that during the previous night, defendant pulled down her pants and took pictures of her vagina. The girl's mother reported this to law enforcement. Jane Doe 1's mother also provided law enforcement with a photograph of Jane Doe 1 that depicted what the girl was wearing the previous night during the sleepover.

### C. *The Investigation*

Gabriel Gonzalez, a detective with the Salinas Police Department, was assigned to the case involving Jane Doe 1. Gonzalez found and reviewed the 1996 report involving Jane Does 2, 3, and 4, and he interviewed the three women in addition to Jane Doe 1. Gonzalez obtained a warrant to search defendant's home and vehicles and to seize defendant's phone. Gonzalez and other detectives then stopped a vehicle defendant was in and took possession of the cell phone defendant had on him, based on Jane Doe 1's report that defendant used his phone to take pictures of defendant's sexual abuse of her. Gonzalez called the phone number Jane Doe 1's mother had provided for defendant, and the cell phone taken from defendant rang.

Gonzalez then obtained two electronic communications search warrants to search the contents of the phone along with a tablet found at defendant's home. After obtaining the first electronic communications search warrant, Gonzalez used defendant's finger to unlock the phone and searched the phone's contents, finding "dozens of images of young girls" on the phone, with many of the images "focused on the buttocks of these young girls." After obtaining the second electronic communications search warrant, Gonzalez again used defendant's finger to unlock the phone. Gonzalez then searched the phone's contents and found three videos of Jane Doe 1 wearing the same clothing as in the photograph Jane Doe 1's mother had provided police. These videos each depicted Jane Doe 1 lying in bed with her eyes closed as the camera approached and a hand pulled

5

down her shorts and touched her vagina. Gonzalez also found sexually explicit images of other young girls on the phone.

**D.** *Pretrial and Trial Proceedings*

Defendant moved in limine to suppress the results of the search of his cell phone, alleging that the compelled use of his fingerprint constituted an unreasonable warrantless search, violated his privilege against compulsory self-incrimination, and violated his right to due process. The trial court denied defendant's motion. The prosecution also moved to admit expert testimony from Dr. Anthony Urquiza concerning behavior by child sexual abuse victims, while the defense moved to "exclude and or limit" testimony regarding child sexual abuse accommodation syndrome. The trial court ruled Dr. Urquiza could testify to the limited matters the prosecutor identified. The prosecutor also moved under Evidence Code section 1108 to be permitted to argue that evidence of defendant's commission of sexual offenses against one alleged victim could be used to prove defendant's propensity to commit sexual offenses against the other alleged victims. The trial court granted the prosecutor's motion, permitting the prosecution "to argue propensity under [section] 1108 of the Evidence Code as to the charged offenses."

At trial, Jane Does 1, 2, 3, and 4 testified, along with the mothers of Jane Doe 1 and Jane Does 2 through 4. Gonzalez testified about what was discovered on defendant's cell phone. Finally, Dr. Urquiza testified for the prosecution as an expert in the psychological effects of child sexual abuse. Defendant did not testify, and the defense called no witnesses and presented no evidence.

Following Dr. Urquiza's testimony and again following closing arguments, the trial court instructed the jury in accordance with CALCRIM No. 1193, which instructed the jury concerning permissible and impermissible uses of Dr. Urquiza's testimony. This instruction stated in relevant part: "Dr. Urquiza's testimony about the psychological effects of child sexual abuse and general myths and misconceptions is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes

6

with which he was not charged.  [¶]  You may consider this evidence only in deciding whether or not the conduct of Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4, was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."  The trial court also instructed the jury in accordance with CALCRIM No. 1191B, which informed the jury that if the prosecution proved beyond a reasonable doubt that defendant committed one or more of the lewd and lascivious acts counts (counts 1, 2, 3, 8, 9, 10, and 11), "you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case."

In the rebuttal argument, the prosecutor stated:  "So you are going to see an instruction in the verdict forms for Counts 8 and 9.  Lessers are basically if you find the defendant not guilty of Counts 8 or 9, then and only then do you consider the lesser offense."  Defense counsel did not object to this statement.

This appeal followed after the jury's verdict and sentencing.

### III.  DISCUSSION

#### A.  *Use of Defendant's Finger to Unlock Phone – Search and Seizure*

##### 1.  **Factual Background**

After receiving the report from Jane Doe 1's mother and obtaining a photograph depicting Jane Doe 1's clothing and appearance the night of the alleged sexual abuse, Gonzalez obtained a warrant on August 23, 2018 to search defendant's residence, vehicle, and person, and to seize defendant's cell phone "and the data, photographs, messages, and information contained on the cellular device."  Gonzalez surveilled defendant's home, and when he saw defendant leave the home in a vehicle, Gonzalez and other detectives stopped the vehicle on August 24, 2018 and seized defendant's cell phone.  Gonzalez called the phone number Jane Doe 1's mother had given him for defendant, and the cell phone taken from defendant rang.

7

Gonzalez then obtained a second warrant on August 24, 2018 to search defendant's phone along with a tablet found at defendant's home. This electronic communications search warrant authorized police to search the phone for evidence including photos and videos. Nothing on the face of the electronic communications search warrant referenced whether or how police could unlock the phone. However, the statement of probable cause that Gonzalez signed and that accompanied the affidavit states: "Your affiant requests permission to contact [defendant] so that we can use his fingerprint to open his cell phone and go into the settings and turn off security features in order to keep the phone unlocked so it can be searched. It has been my training and experience that newer smart phones are difficult to access absent the passcode or fingerprint even with recent technological advancements. . . . [¶] Your affiant will attempt to get [defendant's] cooperation in order to obtain his fingerprint. Should he not cooperate with you[r] magistrate's order, your affiant request[s] permission to use reasonable force to obtain his fingerprint on his cell phone." Gonzalez took the warrant to the jail where defendant was located, and Gonzalez took defendant's right hand and guided defendant's fingers one by one to the phone without using "physical force" in an attempt to unlock the phone. None of the fingers on defendant's right hand unlocked the phone, so Gonzalez then asked for defendant's left hand. Gonzalez then "grabbed" defendant's left hand and "guided it towards the phone." As Gonzalez did so, defendant "momentarily pulled away" before complying and allowing Gonzalez to guide his hand toward the phone without physically resisting. However, defendant told Gonzalez, "I'm not giving you permission to do that." A fingerprint on defendant's left hand unlocked the phone, and Gonzalez looked through the contents of the phone, observing "dozens of images of young girls" on the phone, with many of the images "focused on the buttocks of these young girls." However, as Gonzalez handed the phone off to a member of the police department's computer forensic team, the device locked. Police could not bypass

8

the requirement to provide a fingerprint to unlock the phone, because doing so required a passcode.

Because the phone locked and defendant's fingerprint was again required to unlock the phone, Gonzalez then obtained another electronic communications search warrant concerning the phone, also on August 24, 2018. As with the earlier electronic communications search warrant, this warrant contained nothing on its face referencing whether or how police could unlock the phone, but Gonzalez's statement of probable cause requested permission to contact defendant to obtain his fingerprint to unlock the phone and to use reasonable force if necessary to obtain defendant's fingerprint. Gonzalez again brought this warrant to the jail and asked defendant for his hand. Defendant objected, stating that he wanted his attorney to review the warrant and to be present, but he did not physically resist. Gonzalez testified that he heard another detective tell defendant, "Look, man, we don't want to make this more difficult than it has to be, and we're going to get your thumbprint on that phone whether you like it or not." Gonzalez also testified that he heard the other detective say, "So you could either just do it and get it over with and deal with your day in court with it, or it's not going to be fun." Gonzalez guided the same finger that earlier unlocked the phone to the phone without using physical force, and the phone unlocked. Gonzalez then searched the phone's contents and found three videos of Jane Doe 1 wearing the same clothing as in the photographs Jane Doe 1's mother had provided to the police. These videos each depicted Jane Doe 1 lying in bed with her eyes closed as the camera approached and a hand pulled down her shorts and touched her vagina. Gonzalez also found sexually explicit images of other young girls on the phone that formed the basis for the count of possession of matter depicting a minor engaging in sexual conduct (count 7).

### 2. Legal Principles and Standard of Review

"When reviewing issues relating to the suppression of evidence derived from governmental searches and seizures, we defer to the court's factual findings, express or

9

implied, where supported by substantial evidence. [Citation.] To determine whether, based on the facts so found, a search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citation.]" (*People v. Fayed* (2020) 9 Cal.5th 147, 186.)

"The Fourth Amendment to the United States Constitution prohibits 'unreasonable searches and seizures.' In general, a law enforcement officer is required to obtain a warrant before conducting a search. [Citation.] Warrantless searches 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' [Citations.]" (*People v. Lopez* (2019) 8 Cal.5th 353, 359.) In general, the warrant requirement applies to searches of cell phones because of the "broad array of private information" contained in modern cell phones. (*Riley v. California* (2014) 573 U.S. 373, 397 (*Riley*).)

"A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." (*United States v. Jacobsen* (1984) 466 U.S. 109, 113, fn. omitted.) "Invasions of the body, including nonconsensual extractions of an incarcerated felon's blood for DNA profiling, are searches entitled to the protections of the Fourth Amendment. [Citation.] 'As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." ' [Citation.]" (*People v. Robinson* (2010) 47 Cal.4th 1104, 1119–1120.) " 'Reasonableness . . . is measured in objective terms by examining the totality of the circumstances' [citation], and 'whether a particular search meets the reasonableness standard " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " ' [Citations.]" (*Id.* at p. 1120.)

### 3. Analysis

At the conclusion of defendant's motion to suppress the results of the search of defendant's phone, the trial court denied the motion. Regarding defendant's

unreasonable search and seizure argument, the trial court cited Gonzalez's probable cause statements that asked permission to use reasonable force to obtain defendant's fingerprint to unlock the cell phone. The trial court ruled that probable cause supported the warrants, and that "the statement of probable cause was properly incorporated by reference into the search warrants." The trial court also cited several cases for the proposition that police officers are permitted to "use reasonable force to carry out a bodily intrusion search if the suspect forcibly resists a lawful but nonconsensual search." The trial court concluded law enforcement's actions in this case were less intrusive than other situations that have been held to constitute reasonable force to carry out a search, such as forcing a suspect to submit to a blood draw, provide a urine sample, remove evidence from his or her mouth, submit to a strip search, or submit to a body cavity search. The trial court ruled that Gonzalez used reasonable force in requiring defendant to produce his fingerprint to unlock the phone, noting that Gonzalez did not injure defendant, did not use any "forceful control holds," and did not violate defendant's personal privacy, concluding: "the officers utilized verbal commands and used the minimal amount of force necessary to guide his fingers onto the cellphone screen." The trial court also concluded that the evidence did not need to be suppressed because law enforcement would have inevitably discovered the contents of defendant's phone through other technological means, and because the good faith exception to the Fourth Amendment exclusionary rule applied.

Gonzalez obtained two electronic communications search warrants to search the contents of the phone. Defendant therefore does not appear to challenge the search of the phone itself as a violation the Fourth Amendment. Instead, he alleges that law enforcement violated his Fourth Amendment right to be free from unreasonable searches because "the forced extraction of [defendant's] biometric data, in the form of his fingerprint, without a separate warrant specifically requesting extraction of that data, constituted an unreasonable search." The parties dispute whether the compelled use of defendant's fingerprint constitutes a search entitled to Fourth Amendment protection,

11

whether the electronic search communications warrants provided law enforcement with authority to compel defendant to produce his fingerprint, and whether—if a warrant was required to use defendant's fingerprint to unlock the phone but such a warrant was not obtained—suppression of the evidence from defendant's phone is required under the exclusionary rule. We conclude that even assuming the compelled use of defendant's fingerprint constitutes a search within the meaning of the Fourth Amendment, the electronic communications search warrants issued by the magistrate authorized law enforcement officials to require defendant to produce his fingerprint to unlock the phone. Thus, no Fourth Amendment violation occurred. Moreover, even assuming a Fourth Amendment violation occurred because the warrant did not encompass the compelled use of defendant's fingerprint, the evidence discovered on defendant's phone was not required to have been excluded because the good faith exception to the exclusionary rule applies.

"The scope of a warrant is determined by its language, reviewed under an objective standard without regard to the subjective intent of the issuing magistrate or the officers who secured or executed the warrant. [Citations.] . . . As many courts have observed, 'officers executing a search warrant are "required to interpret it," and they are "not obliged to interpret it narrowly." ' [Citation.] To satisfy the objective standard, the officer's interpretation must be reasonable." (*People v. Balint* (2006) 138 Cal.App.4th 200, 207.) "While we do not interpret warrants narrowly, we must interpret them reasonably. [Citation.]" (*People v. Nguyen* (2017) 12 Cal.App.5th 574, 583.)

In both electronic communications search warrants, Gonzalez's probable cause statements to the magistrate specifically requested permission to contact defendant to obtain his fingerprint to open the phone, and the statements both read: "Your affiant will attempt to get [defendant's] cooperation in order to obtain his fingerprint. Should he not cooperate with you[r] magistrate's order, your affiant request[s] permission to use reasonable force to obtain his fingerprint on his cell phone." The warrants ordered law

12

enforcement to search the cell phone for stored electronic communications, including images and videos. Law enforcement could not comply with the warrants and search the phone without unlocking it, a fact Gonzalez clearly communicated to the magistrate in the affidavits accompanying the warrant applications. Gonzalez's statements of probable cause were incorporated by reference into the warrants. Both electronic communications search warrants stated: "The facts in support of this warrant are contained in the Statement of Probable Cause and any exhibits, which are *attached* hereto and incorporated by reference." In fact, the second electronic communications search warrant (the third warrant overall that Gonzalez obtained in this matter) specifically noted that police had used defendant's finger to unlock the phone, but that police could not turn off the screen lock function without a passcode, and therefore the phone locked after police conducted an initial review of the phone. There would be no need to seek the second electronic communications search warrant if defendant's fingerprint was not necessary, as the re-locking of the phone was the reason for the additional warrant. A reasonable officer in Gonzalez's position would have understood that the warrants authorized him to obtain defendant's fingerprint to unlock the phone, and to use reasonable force to compel defendant to produce his fingerprint.

The trial court agreed with this conclusion, ruling that Gonzalez's statements of probable cause were incorporated by reference into the warrants, and thus Gonzalez's actions in compelling defendant to provide his fingerprint to unlock the phone were not warrantless. Defendant argues that the trial court erred in this respect, because he asserts that the face of the warrant must authorize the compelled use of a fingerprint to unlock a phone. Relatedly, he asserts that because the face of the warrant does not specifically authorize law enforcement to compel the use of defendant's fingerprint to unlock the phone, "there is no guarantee that the magistrate issuing the warrant was aware the officers planned to extract [defendant's] biometric data or use force in doing so."

13

However, defendant cites no authority for the proposition that the magistrate's authorization to use his fingerprint was required to be contained on the face of the warrant rather than in the probable cause statement that was incorporated into the warrant. Generally, "the scope of the officer's authority is determined from the face of the warrant and not from the affidavit." (*Thompson v. Superior Court* (1977) 70 Cal.App.3d 101, 109.) Here, nothing on the face of the warrant either specifically authorized Gonzalez to unlock the phone with defendant's fingerprint or prohibited Gonzalez from taking this action. A deficient description of the place to be searched or items to be seized may be cured by reference to the affidavit where "(1) the affidavit accompanies the warrant at the time it is served, and (2) the warrant uses suitable words of reference which incorporate the affidavit by reference. [Citations.]" (*People v. MacAvoy* (1984) 162 Cal.App.3d 746, 755.) "The requirement that the affidavit be incorporated into and attached to the warrant insures that both the searchers and those threatened with search are informed of the scope of the searcher's authority. [Citations.] 'When the affidavit is incorporated into the warrant and limits the generality of the description in the warrant, the discretion of the officers executing the warrant is limited. When the affidavit accompanies the warrant the person being searched has notice of the specific items the officer is entitled to seize . . . .' [Citation.] Thus, the requirements of incorporation by reference and attachment provide the same protection provided by an adequate description on the face of the warrant: clear notice to the executing officer and those subject to search of the authorized scope of the search *at the time the warrant is executed*." (*Id.* at pp. 755–756.)

The Fourth Amendment does not prohibit "a warrant from cross-referencing other documents. Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant. [Citations.]" (*Groh v. Ramirez* (2004) 540 U.S. 551, 557–558.) Here, there is

14

no dispute that the warrants used appropriate words to incorporate Gonzalez's probable cause affidavits, and that the affidavits accompanied the warrants at the time they were served. Both electronic communications search warrants stated: "The facts in support of this warrant are contained in the Statement of Probable Cause and any exhibits, which are *attached* hereto and incorporated by reference." The use of defendant's fingerprint to unlock the phone was the means by which the search of the phone was to be conducted, not an end unto itself. The magistrate knew from the probable cause statement that use of defendant's fingerprint was likely to be necessary for the search of the phone to be carried out, and the magistrate authorized the search with this knowledge. Therefore, even assuming the compelled use of defendant's finger to unlock the phone constituted a "search" under the Fourth Amendment, the warrant authorized law enforcement to utilize defendant's fingerprint to unlock the phone before searching it, and law enforcement thus complied with the Fourth Amendment's warrant requirement.

Even if the electronic communications search warrants could not be reasonably understood to encompass the compelled use of defendant's fingerprint, suppression of the evidence discovered on defendant's phone was not required because the good faith exception to the exclusionary rule applies. "Exclusion of evidence due to a Fourth Amendment violation is not automatic." (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1219.) While the exclusionary rule " 'bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation,' " "the deterrent purpose of the rule is not served by excluding evidence when an officer reasonably acts in objective good faith." (*Id.* at p. 1220.) " 'If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " (*United States v. Leon* (1984) 468 U.S. 897, 919 (*Leon*).) The good faith exception assumes "that the officers properly executed the warrant and searched only those places

15

and for those objects that it was reasonable to believe were covered by the warrant." (*Id.* at p. 918, fn. 19.)

In *Leon*, the United States Supreme Court "set forth four scenarios in which such objectively reasonable reliance should not be found and suppression remained the appropriate remedy:  (1) '[T]he magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth'; (2) if 'the issuing magistrate wholly abandoned his [or her] judicial role'; (3) the affidavit is ' "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" '; or (4) if the warrant was 'so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.'  [Citation.]"  (*People v. Meza* (2023) 90 Cal.App.5th 520, 543.) "The government bears the burden to establish applicability of the good faith exception. [Citation.]"  (*Ibid.*)

Here, even if the compelled use of defendant's fingerprint to unlock the phone constituted a search, and even if the warrant did not authorize the compelled use of defendant's fingerprint to unlock the phone, the prosecution established that the good faith exception applies.  Gonzalez sought and obtained three warrants, including two electronic communications search warrants.  His probable cause statements specifically spelled out the request to obtain defendant's fingerprint to unlock the phone, and the need to use reasonable force, if necessary, to obtain defendant's fingerprint to unlock the phone.  In addition, Gonzalez's probable cause statement for the second electronic communications search warrant specifically noted that police had used defendant's fingerprint to unlock the phone once, but that using his fingerprint to unlock the phone again was necessary because the screen lock function could not be disabled without a passcode.  None of the four *Leon* scenarios where the good faith exception does not apply is present here.  Defendant points to no misinformation in Gonzalez's affidavits.  No

16

evidence was presented to the trial court concerning the magistrate abandoning a judicial role. For the reasons articulated above, even though nothing on the face of the warrant specifically authorized Gonzalez to unlock the phone with defendant's fingerprint, the warrant would have been reasonably understood to include this action, and thus the warrant was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Finally, for similar reasons, the warrant did not fail to particularize the place to be searched or the things to be seized such that Gonzalez could not reasonably presume it to be valid. The object of the search was clear: based on Jane Doe 1's report of recent sexual abuse captured on defendant's phone, police were to seize the phone and search it for evidence including images or videos of the abuse. In order to search the phone, unlocking it was necessary, a fact the probable cause statements clearly informed the magistrate of. Gonzalez's affidavit listed in detail the information that indicated that evidence of defendant's crimes would be found on the phone. Defendant does not assert that probable cause to support the search of the phone was lacking. If law enforcement officials committed any error, the error was limited to not specifically listing on the face of the warrant the need to use defendant's fingerprint to unlock the phone. However, this matter was addressed in the affidavit and was incorporated by reference into the warrant. Under these facts, no deterrent purpose would be served by excluding the evidence, as Gonzalez and other law enforcement officials reasonably acted in objective good faith on the issuance of two electronic communications search warrants.[2] (*Leon*, *supra*, 468 U.S. at p. 919.)

---

[2] Our resolution of this matter means we need not decide whether the inevitable discovery doctrine applies, which the Attorney General asserts is another basis for concluding that the evidence from defendant's cell phone should not be suppressed.

17

### B. Use of Defendant's Finger to Unlock Phone – Privilege Against Compulsory Self-Incrimination

Defendant next argues that the compelled use of his finger to unlock the phone violated his privilege against compulsory self-incrimination under the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution. Defendant argues that the use of his fingerprint to unlock the phone was compelled, incriminating, and testimonial, and therefore violated his privilege against compulsory self-incrimination. The Attorney General responds that "the trial court reasonably held that requiring [defendant] to use his finger to unlock his phone was not tantamount to compelled testimony." The Attorney General also asserts that compelling defendant to provide his fingerprint to unlock the phone did not violate defendant's privilege against compulsory self-incrimination because this act produced nontestimonial evidence under the "foregone conclusion" doctrine.

### 1. Legal Principles and Standard of Review

"It is error under the United States Constitution to admit a defendant's coerced confession into evidence at a criminal trial. [¶] The Fifth Amendment establishes a privilege against self-incrimination: 'No person . . . shall be compelled in any criminal case to be a witness against himself . . . .'" (*People v. Cahill* (1993) 5 Cal.4th 478, 512.) "Separately and independently, it is error under the California Constitution to admit a defendant's coerced confession into evidence at a criminal trial. . . . For present purposes, the state constitutional privilege is much the same as the federal. [Citation.]" (*Id.* at p. 514.) "At its core, the privilege protects against the 'cruel trilemma of self-accusation, perjury or contempt.' [Citation.] Accordingly, the amendment prohibits the direct or derivative *criminal use* against an individual of 'testimonial' communications of an incriminatory nature, obtained from the person under official compulsion. [Citations.]" (*People v. Low* (2010) 49 Cal.4th 372, 390.) Thus, "[t]o qualify for the Fifth Amendment privilege, a communication must be testimonial,

incriminating, and compelled. [Citation.]" (*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.* (2004) 542 U.S. 177, 189.)

"[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself [or herself]." (*Doe v. United States* (1988) 487 U.S. 201, 210, fn. omitted (*Doe*).) "Thus, a suspect may be compelled to furnish a blood sample, [citation]; to provide a handwriting exemplar, [citation], or a voice exemplar, [citation]; to stand in a lineup, [citation]; and to wear particular clothing, [citation]. These decisions are grounded on the proposition that 'the privilege protects an accused only from being compelled to testify against himself [or herself], or otherwise provide the State with evidence of a testimonial or communicative nature.' [Citation.]" (*Ibid.*) "It is the 'extortion of information from the accused,' [citation], the attempt to force him [or her] 'to disclose the contents of his [or her] own mind,' [citation], that implicates the Self-Incrimination Clause. [Citation.] 'Unless some attempt is made to secure a communication -- written, oral or otherwise -- upon which reliance is to be placed as involving [the accused's] consciousness of the facts and the operations of his [or her] mind in expressing it, the demand made upon him [or her] is not a testimonial one.' [Citation.]" (*Id.* at p. 211, fn. omitted.) Thus, "[r]equests by the prosecution for handwriting and fingerprint evidence from a defendant or a suspect are not prohibited by the Fifth Amendment right against self-incrimination because such evidence is not testimonial in nature. [Citations.]" (*Northern Mariana Islands v. Bowie* (2001) 243 F.3d 1109, 1120, fn. 5.)

In *United States v. Hubbell* (2000) 530 U.S. 27 (*Hubbell*), the United States Supreme Court provided further direction as to what kinds of activity can constitute testimonial evidence. In *Hubbell*, the court held that compelling the defendant to produce potentially incriminating documents could violate the privilege against self-incrimination because in producing the documents, "[i]t was unquestionably necessary for respondent

19

to make extensive use of 'the contents of his own mind' in identifying the hundreds of documents responsive to the requests in the subpoena. [Citation.] The assembly of those documents was like telling an inquisitor the combination to a wall safe, not like being forced to surrender the key to a strongbox. [Citation.]" (*Id.* at p. 43.)

In *United States v. Dionisio* (1973) 410 U.S. 1 (*Dionisio*), the United States Supreme Court held that compelling voice exemplars from the defendant did not violate his privilege against compulsory self-incrimination. (*Id.* at p. 5.) The court noted: "It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by the privilege against compulsory self-incrimination." (*Id*. at pp. 5–6.) The court stated: "The voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said." (*Id.* at p. 7, fn. omitted.) Similarly, in *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*), the United States Supreme Court held that a compulsory blood draw did not violate the defendant's privilege against compulsory self-incrimination. (*Id.* at p. 761.) The court distinguished between a suspect's communications (which are protected by the Fifth Amendment), and actions such as "compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture," which are not protected by the privilege against compulsory self-incrimination. (*Schmerber*, *supra*, at p. 764, fn. omitted.) The court held: "The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." (*Id.* at p. 764.) While the court noted that in some instances, this distinction might not comport with the intent of the Fifth Amendment, it nonetheless applied this distinction, holding that "[n]ot even a shadow of testimonial compulsion

20

upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis." (*Schmerber*, *supra*, at p. 765.)

In *Fisher v. United States* (1976) 425 U.S. 391 (*Fisher*), the United States Supreme Court recognized that while the compelled production of taxpayer records could implicate the privilege against compulsory self-incrimination, under the facts of the case before it, "however incriminating the contents of the accountant's workpapers might be, the act of producing them – the only thing which the taxpayer is compelled to do – would not itself involve testimonial self-incrimination." (*Id.* at pp. 410–411.) The court held: "It is doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment. The papers belong to the accountant, were prepared by him, and are the kind usually prepared by an accountant working on the tax returns of his [or her] client. Surely the Government is in no way relying on the 'truthtelling' of the taxpayer to prove the existence of or his [or her] access to the documents. [Citation.] The existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he [or she] in fact has the papers. Under these circumstances by enforcement of the summons 'no constitutional rights are touched. The question is not of testimony but of surrender.' [Citation.]" (*Id.* at p. 411.)

In such a situation, the *Fisher* court held, a defendant's "Fifth Amendment privilege is not violated because nothing he [or she] has said or done is deemed to be sufficiently testimonial for purposes of the privilege." (*Fisher*, *supra*, 425 U.S. at p. 411.) The court also observed that the production of the accountant's papers had no significant testimonial significance, holding that "we are quite unprepared to hold that either the fact of existence of the papers or of their possession by the taxpayer poses any realistic threat of incrimination to the taxpayer." (*Id.* at p. 412.) The court also discounted the defendant's argument that producing the tax records would authenticate the documents, stating: "[P]roduction would express nothing more than the taxpayer's

21

belief that the papers are those described in the subpoena.  The taxpayer would be no more competent to authenticate the accountant's workpapers or reports by producing them than he would be to authenticate them if testifying orally.  The taxpayer did not prepare the papers and could not vouch for their accuracy.  The documents would not be admissible in evidence against the taxpayer without authenticating testimony.  Without more, responding to the subpoena in the circumstances before us would not appear to represent a substantial threat of self-incrimination." (*Id.* at pp. 412–413, fn. omitted.)  Thus, the court held, "compliance with a summons directing the taxpayer to produce the accountant's documents involved in these cases would involve no incriminating testimony within the protection of the Fifth Amendment." (*Id.* at p. 414.)

Based on *Fisher*, federal appeals courts have defined when the "foregone conclusion doctrine" applies such that the Fifth Amendment privilege against compulsory self-incrimination is not implicated.  For example, the Second Circuit Court of Appeals in *United States v. Greenfield* (2nd Cir. 2016) 831 F.3d 106 (*Greenfield*), held that the prosecution must establish " 'with reasonable particularity' " that it knew of the existence and control of the compelled evidence for the foregone conclusion doctrine to apply.  (*Id.* at p. 116.)  In *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011* (11th Cir. 2012) 670 F.3d 1335, the Eleventh Circuit Court of Appeals held:  "Where the location, existence, and authenticity of the purported evidence is known with reasonable particularity, the contents of the individual's mind are not used against him [or her], and therefore no Fifth Amendment protection is available." (*Id.* at p. 1344, fn. omitted.)  The Ninth Circuit Court of Appeals has held that the foregone conclusion doctrine "allows for circumvention of the self-incrimination privilege if the government already has the information it is seeking to compel. [Citation.]" (*United States v. Oriho* (9th Cir. 2020) 969 F.3d 917, 927 (*Oriho*).)  The Ninth Circuit held:  "For this 'exception to apply, the government must establish its independent knowledge of three elements:  the documents'

existence, the documents' authenticity and [the defendant's] possession or control of the documents.' [Citation.]" (*Ibid.*)

In determining whether a defendant's privilege against compulsory self-incrimination has been violated, "[w]e review deferentially the trial court's resolution of any factual disputes. [Citation.]" (*People v. Seijas* (2005) 36 Cal.4th 291, 304.) However, where the facts are undisputed, we review independently the trial court's conclusion that a defendant's privilege against compulsory self-incrimination was not violated. (*Ibid.*)

### 2. Analysis

The defense's motion to suppress the evidence from defendant's phone alleged that the compelled use of defendant's finger to unlock the phone violated his privilege against compulsory self-incrimination because his act of providing his fingerprint constituted a testimonial communication. The trial court's ruling rejected this argument, concluding that the use of defendant's fingerprint was not a testimonial communication or act. The trial court stated: "The seizure of a finger in itself does not reveal the contents of the person's mind in the way that disclosure of a pass code would or in the way that disclosure of a cryptography key to decrypt encrypted data would compel someone to reveal a specific pass code or to reveal information on how to decrypt data is compelling testimony from that person. But obtaining information from a person's mind is not what happens when agents pick a finger to apply to the sensor under the screen of a cellphone. [¶] To be clear, there is no revelation of the contents of the defendant's mind with the procedure utilized by the officers in this case for the use of the defendant's fingerprint. [¶] Instead, the officers chose the finger to apply to the sensor on the cellphone screen and obtained the physical characteristics without the need for the defendant to put any thought at all into the seizure. [¶] Thus, the use of the defendant's fingerprint is much more like the compelled use of other physical characteristics of criminal suspects that Courts have found non-testimonial, even when they are used for

investigatory purposes rather than solely for [i]dentification.  [¶]  Compelling physical access to information via the fingerprint seizure is also not different from requiring someone to surrender a key to a safe whose contents otherwise would not be accessible to the government.  [¶]  The surrender of the key may be compelled, but the compelling of the safe's combination is forbidden. . . .  [¶]  The Fifth Amendment privilege was not triggered in this matter because the officers merely compelled the physical act and the defendant was not called upon to make use of the contents of his mind."

Additionally, the trial court concluded that the Fifth Amendment privilege against compelled self-incrimination was not violated because the act of using defendant's fingerprint was not testimonial under the foregone conclusion doctrine.   The trial court concluded that the prosecution in defendant's case "can show with reasonable particularly that at the time the officer sought to compel the act of production with both warrants, they already knew of the photographs or video, thereby making any testimonial aspect a foregone conclusion."  The trial court ruled:  "The officers in this matter knew of the existence of the photographs in the defendant's cellphone, knew that the defendant possessed the cellphone that was used to photograph Jane Doe 1, and could establish authenticity not through the use of the defendant's mind, but rather through testimony from others.  [¶]  The existence, location and authenticity of [the] requested materials in this case were foregone conclusions."

The parties have identified no United States Supreme Court or California decisions holding whether the compelled use of a suspect's fingerprint amounts to self-incrimination.  However, decisions from other jurisdictions have addressed this issue.

In *State v. Diamond* (Minn. 2018) 905 N.W.2d 870 (*Diamond*), the Supreme Court of Minnesota held that no violation of the defendant's Fifth Amendment privilege against compulsory self-incrimination occurred when police compelled the defendant to unlock his seized cell phone with his fingerprint.  (*Diamond, supra*, at p. 878.)  The court distinguished the United States Supreme Court's decision in *Hubbell*, *supra*, concluding:

24

"Because we conclude that producing a fingerprint is more like exhibiting the body than producing documents, we hold that providing a fingerprint to unlock a cellphone is *not* a testimonial communication under the Fifth Amendment. The police compelled Diamond's fingerprint for the fingerprint's physical characteristics and not for any implicit testimony from the act of providing the fingerprint. [Citation.] Moreover, the fingerprint was physical evidence from Diamond's body, not evidence of his mind's thought processes. [Citation.]" (*Diamond*, *supra*, at p. 875.) The court cited two reasons in support of its conclusion. First, the court stated, "[T]he State compelled Diamond to provide his fingerprint only for the physical, identifying characteristics of Diamond's fingerprint, not any communicative testimony inherent in providing the fingerprint. The State's use of Diamond's fingerprint was therefore like a 'test' to gather physical characteristics, akin to a blood sample, a voice exemplar, trying on clothing, or standing in a lineup, in an effort to unlock the cellphone. [Citations.]" (*Id.* at pp. 875–876.) Second, the court stated, "Diamond's act of providing a fingerprint to the police was not testimonial because the act did not reveal the contents of Diamond's mind. [Citations.]" (*Id.* at p. 876.) Thus, the court concluded, "Diamond merely provided his fingerprint so that the police could use the physical characteristics of the fingerprint to unlock the cellphone. The compelled act did not require Diamond to 'submit to testing in which an effort [was] made to determine his guilt or innocence on the basis of physiological responses, whether willed or not.' [Citation.] To the extent that providing a fingerprint to unlock a cellphone might require a mental process to unlock the phone, the police did not need to rely on that mental process here. [Citation.] Diamond did not need to self-select the finger that unlocked the phone. He did not even need to be conscious. Diamond could have provided all of his fingerprints to the police by making his hands available to them, and the police could have used each finger to try and unlock the cellphone." (*Id.* at p. 877, fns. omitted.) Thus, the court held that this situation was more like that in *Dionisio* and *Schmerber* than *Hubbell*. (*Diamond*, *supra*, at p. 875.)

25

Several decisions by other courts have similarly held that the compelled use of a defendant's fingerprint to unlock a phone does not constitute a testimonial act, and therefore that no Fifth Amendment violation occurs in this situation.  (*United States v. Barrera* (N.D.Ill. 2019) 415 F.Supp.3d 832, 833 (*Barrera*) ["[T]his Court holds that compelling an individual to scan their biometrics, and in particular their fingerprints, to unlock a smartphone device neither violates the Fourth nor Fifth Amendment"]; *In re Search of a White Google Pixel 3 XL Cellphone in a Black Incipio Case* (D.Idaho 2019) 398 F.Supp.3d 785, 793–794, fns. omitted ["Where, as here, the Government agents will pick the fingers to be pressed on the Touch ID sensor, there is no need to engage the thought process of the subject at all in effectuating the seizure.  . . .  Accordingly, the Court determines—in accordance with a majority of Courts that have weighed in on this issue—that the requested warrant would not violate the Fifth Amendment because it does not require the suspect to provide any testimonial evidence"]; *In the Matter of the Search of [Redacted] Washington, D.C.* (D.D.C. 2018) 317 F.Supp.3d 523, 535 [no Fifth Amendment violation because "the compelled use of the Subject's biometric features is far more akin to the surrender of a safe's key than its combination" (fn. omitted)]; *In the Matter of the Search Warrant Application for [Redacted]* (N.D.Ill. 2017) 279 F.Supp.3d 800, 801 ["requiring the application of the fingerprints to the sensor does not run afoul of the self-incrimination privilege because that act does not qualify as a testimonial communication"]; *Commonwealth v. Baust* (Va.Cir.Ct., Oct. 28,  2014, No. CR14-1439), 2014 Va.Cir. Lexis 93, pp. *9–10 ["The fingerprint like a key . . . does not require the witness to divulge anything through his mental processes.  On the contrary, like physical characteristics that are non-testimonial, the fingerprint of Defendant if used to access his phone is likewise non-testimonial and does not require Defendant to 'communicate any knowledge' at all"].)

We agree with the decisions from other jurisdictions that hold that compelling a suspect to place his or her a finger on a phone does not constitute a testimonial act.

Therefore, under the facts of the instant matter, the act of compelling defendant to place his fingers on the phone to unlock it did not violate defendant's privilege against compulsory self-incrimination. Defendant was not asked to communicate anything – verbally or otherwise – in the act of placing his fingers on the phone. Law enforcement used defendant's fingerprint solely for its physical characteristics as a biometric key to unlock the phone, not for any implicit testimony from defendant's act of providing his fingerprint. Defendant was not asked to produce any evidence of his mental process, particularly because Gonzalez selected the finger(s) to be used in unlocking the phone. As in *Diamond*, defendant did not self-select the finger to be used to unlock the phone; he did not even need to be conscious for law enforcement to obtain his fingerprint and unlock the phone. Defendant was thus not asked to engage in any thought process in unlocking the phone. He merely provided his physical characteristic – a fingerprint – that served as the key to the strongbox that was defendant's phone. The actions by law enforcement in compelling defendant to place his finger on the phone were functionally equivalent to the gathering of other physical characteristics that do not present self-incrimination concerns, such as blood samples or fingerprints (*Schmerber)* or voice exemplars (*Dionisio*). Law enforcement sought defendant's finger merely as a mechanism to unlock the phone, not for any testimonial communication that might be implicit in this action.

Defendant nonetheless argues that his act in producing his fingerprint to unlock the phone had some testimonial nature. Specifically, he asserts that his use of his finger to unlock the phone communicated that "he had previously accessed the phone and had some level of control over the phone and its contents." However, any marginal communication implicit in defendant's act concerning his access to and control over the phone was already known by law enforcement. Jane Doe 1 identified that defendant used a phone to capture his sexual abuse of her. Jane Doe 1 reported defendant's action to her mother on August 5, 2018, the day following the sleepover. Jane Doe 1's mother

promptly reported this to law enforcement, and law enforcement seized defendant's phone on August 24, 2018, less than three weeks after defendant used it in his crimes. When police stopped defendant, he only had one phone in his possession. Gonzalez called the phone number Jane Doe 1's mother had provided him for defendant, and defendant's phone rang. In addition, by the time of the second use of defendant's fingerprint, Gonzalez had already reviewed the contents of the phone and had verified defendant's access to and control over the phone by reviewing some of its contents. Thus, defendant's access to and control over the phone was well established apart from any communication along these lines implicit in defendant placing his finger on the phone to unlock it.

Defendant argues that the foregone conclusion doctrine should not apply because "the officers did not anticipate finding the photographs and video of other young girls, which were introduced into evidence at trial and did not feature Doe 1." However, defendant fails to identify any testimony his fingerprint produced in this regard. Defendant's act of producing his finger to unlock the phone conveyed no testimony about the contents of the phone. The fact that officer discovered sexual images of young girls on the phone is a result of the physical search of the phone, not any communication implicit in defendant's act of placing his finger against the phone's screen. At most, the use of defendant's finger merely confirmed what law enforcement officials already knew – that defendant had access to and control over the phone.

As the trial court found: "The officers in this matter knew of the existence of the photographs in the defendant's cellphone, knew that the defendant possessed the cellphone that was used to photograph Jane Doe 1, and could establish authenticity not through the use of the defendant's mind, but rather through testimony from others. [¶] The existence, location and authenticity of requested materials in this case were foregone conclusions." In this situation, law enforcement was "in no way relying on the 'truthtelling' " of defendant to prove his access to and control over the phone. (*Fisher*,

28

*supra*, 425 U.S. at p. 411.)  The prosecution established " 'with reasonable particularity' " that it knew of defendant's access to and control over the phone, and thus defendant's act of producing his finger did not produce any testimonial evidence that law enforcement did not already establish as a foregone conclusion.  (*Greenfield*, *supra*, 831 F.3d at p. 116.)  Even assuming defendant's act of producing his finger to unlock the phone had some marginal testimonial quality, the prosecution demonstrated that law enforcement "already ha[d] the information it [was] seeking to compel," and thus the foregone conclusion doctrine applies.  (*Oriho*, *supra*, 969 F.3d at p. 927.)

Defendant cites two decisions in support of his position that his compelled act of placing his finger to the phone to unlock the device was testimonial.  Both are distinguishable.  First, in *In re Application for a Search Warrant* (N.D.Ill. 2017) 236 F.Supp.3d 1066 (*In re Application*), the government sought a warrant "to compel any individual who is present at the subject premises at the time of the search to provide his fingerprints and/or thumbprints 'onto the Touch ID sensor of any Apple iPhone, iPad, or other Apple brand device in order to gain access to the contents of any such device.' " (*Id.* at p. 1067.)  The court denied this aspect of the search warrant, noting that factual deficiencies concerning the lack of detailed information about the resident(s) of the premises were "important for purposes of the Fourth and Fifth Amendment issues presented by this case." (*Id.* at p. 1068.)  Where "the request is made without any specific facts as to who is involved in the criminal conduct linked to the subject premises, or specific facts as to what particular Apple-branded encrypted device is being employed (if any)," the court held that the aspect of the warrant application seeking to compel any person at the premises to produce their fingerprint to unlock a device lacked probable cause under the Fourth Amendment. (*In re Application*, *supra*, at p. 1068.)  The court then stated that "in addition to the Fourth Amendment concerns articulated above, the Court believes that the government's warrant application raises concerns under the Fifth Amendment's protection prohibiting compelled self-incrimination." (*Id.* at p. 1070.)

29

The court stated: "The government is generally correct that the production of physical characteristics generally do not raise Fifth Amendment concerns. [Citations.]" (*Ibid.*) However, under the facts of the instant case, the court held that "the connection of the fingerprint to the electronic source that may hold contraband . . . does 'explicitly or implicitly relate a factual assertion or disclose information.' [Citation.]" (*Id.* at p. 1073.) The court stated: "By using a finger to unlock a phone's contents, a suspect is *producing* the contents on the phone. With a touch of a finger, a suspect is testifying that he or she has accessed the phone before, at a minimum, to set up the fingerprint password capabilities, and that he or she currently has some level of control over or relatively significant connection to the phone and its contents." (*Ibid.*) Thus, the court concluded that "the Court does not find, under the circumstances presented here, that the government has established a proper basis to force any individual at the subject premises to provide a fingerprint or thumbprint in an attempt to unlock any Apple device that may be found." (*Id.* at p. 1074.)

*In re Application* is based on significantly different facts from the instant case, and thus we find it not persuasive as applied to the instant matter. *In re Application* dealt with a warrant application to have any residents present at the premises place their fingers on any Apple devices found on the scene. The court noted a lack of particularity to as to which residents were suspected to be involved in the criminal conduct linked to the premises, and what particular device(s) were suspected to be employed. In the situation before it, the court focused much of its analysis on its Fourth Amendment concerns, only secondarily addressing the Fifth Amendment issue. With regard to its Fifth Amendment analysis, the court stated that a suspect's act of unlocking a phone with his or her fingerprint could communicate access to and control over the device, and thus this act could present a concern about compulsory self-incrimination. As we have stated, no such concerns are present here, where defendant was the only person compelled to produce his fingerprint and his access to and control over the device were foregone conclusions. The

30

court in *In re Application* indicated that under different facts, the Fifth Amendment concern it articulated might not be present. The court stated that "[i]n circumstances where the existence and nature of the electronic information sought is a 'foregone conclusion,' Fifth Amendment jurisprudence tells us that the concerns noted above may be obviated." (*In re Application*, *supra*, 236 F.Supp.3d at p. 1074.) The court noted: "Indeed, after the execution of this warrant, the government may garner additional evidence that addresses both of these concerns such that the government can promptly apply for additional search warrants. We simply are not there yet." (*Ibid.*) Here, unlike in *In re Application*, law enforcement had firmly established defendant's access to and ownership of the phone, and defendant's act of unlocking the phone with his finger provided no testimonial evidence that raises a self-incrimination concern. *In re Application* therefore does not indicate that defendant's act was testimonial.

The second case defendant cites, *In the Matter of the Search of Residence in Oakland, California* (N.D.Cal. 2019) 354 F.Supp.3d 1010 (*Matter of Residence*), is similarly distinguishable. In *Matter of Residence*, the government applied for and received a warrant to seize various items including cell phones. (*Id.* at p. 1013.) However, the court denied the application for a warrant "to compel any individual present at the time of the search to press a finger (including a thumb) or utilize other biometric features, such as facial or iris recognition, for the purposes of unlocking the digital devices found in order to permit a search of the contents as authorized by the search warrant." (*Ibid.*) The court first found that under the Fourth Amendment, probable cause did not exist to support the biometric aspect of the warrant application and that the application was overbroad because two suspects were identified but the request was not limited to a particular person or a particular device. (*Matter of Residence*, *supra*, at p. 1014.) The court then found that the proposed compelled use of fingerprints to unlock items was testimonial, for two reasons. First, the court stated that "biometric features serve the same purpose of a passcode, which is to secure the owner's content,

31

pragmatically rendering them functionally equivalent." (*Id.* at p. 1015.) The court held that "if a person cannot be compelled to provide a passcode because it is a testimonial communication, a person cannot be compelled to provide one's finger, thumb, iris, face, or other biometric feature to unlock that same device." (*Id.* at p. 1016.) Second, the court stated that "requiring someone to affix their finger or thumb to a digital device is fundamentally different than requiring a suspect to submit to fingerprinting," because "the act concedes that the phone was in the possession and control of the suspect, and authenticates ownership or access to the phone and all of its digital contents." (*Ibid.*) The court then held that the foregone conclusion doctrine did not apply because under *Riley*, *supra*, cell phones are subject to "different treatment than more traditional storage devices," and thus "the Government inherently lacks the requisite prior knowledge of the information and documents that could be obtained via a search of these unknown digital devices, such that it would not be a question of mere surrender. [Citation.]" (*Matter of Residence*, *supra*, at pp. 1017, 1018.) In addition, the court found that the foregone conclusion doctrine did not apply because "the Government would be unable to articulate facts to compel the unlocking of devices using biometric features by unknown persons the Government could not possibly anticipate being present during the execution of the search warrant." (*Id.* at p. 1018.)

*Matter of Residence*'s holding was based on different facts than those presented in the instant case. In *Matter of Residence*, the warrant application sought authority to compel "any individual present" to produce a fingerprint to unlock any digital devices found. (*Matter of Residence*, *supra*, 354 F.Supp.3d at p. 1013.) Under these facts, the court found that a Fifth Amendment concern was presented and that the foregone conclusion did not apply. In the instant case, again, defendant was the only person compelled to produce his fingerprint, and he was compelled to do so for one cell phone. Jane Doe 1 had identified defendant as recently using this phone to capture the sexual abuse; Gonzalez verified the phone was defendant's by calling the phone number

provided for defendant; and Gonzalez's first search of the phone further confirmed that defendant had access to and control over the phone. Under these facts, the concerns articulated in *Matter of Residence* are not present. Additionally, the fact that under *Riley* cell phones are subject to different treatment than other storage devices does not alter the analysis. Defendant did not "communicate" the contents of his cell phone to law enforcement by providing his finger, any more than a suspect "communicates" by providing a key to a strongbox; in fact, defendant took no action whatsoever in the instant case. Instead of handing over a key, defendant remained passive while law enforcement tried each of defendant's fingers until one unlocked the phone. The only possible communication implicit in defendant's act of providing his fingerprint was that he had access to and control over the phone, matters that the prosecution established that law enforcement already knew. As the court in *Barrera* noted, *Riley* "did not address any Fifth Amendment concerns with respect to cell phones," and *Riley*'s concerns about warrantless searches of cell phone data and the resulting invasion of privacy are properly addressed when the government seeks a warrant to search the phone. (*Barrera*, *supra*, 415 F.Supp.3d at p. 842.) Post-*Riley*, established Fifth Amendment analysis remains intact with respect to accessing cell phones: "Just as letters were replaced with electronic mail and cassette tapes were replaced with digital music files, keys are being replaced with biometric functions. Consolidation and digitization, resulting in the carrying of the least amount of physical items as possible while holding the most amount of functionality and data, is *de jure* and here to stay. However, the applicable analysis — that a fingerprint has now replaced a key — does not automatically transform what has been previously considered non-testimonial into testimonial acts. The old tests, in this particular circumstance, remain relevant and applicable." (*Barrera*, *supra*, at p. 842.)

Citing *Matter of Residence*, defendant argues that "it is illogical to conclude that forced disclosure of a spoken passcode has Fifth Amendment implications, but forced disclosure of a biometric one has none." To the extent that *Matter of Residence* can be

understood to state that a fingerprint to unlock a phone is testimonial simply because it is the functional equivalent of providing a passcode, we do not agree. Defendant's act of providing his fingerprint to unlock his phone was not testimonial. The fact that phones can be unlocked through other, testimonial, means is not at issue here. As the trial court stated: "The seizure of a finger in itself does not reveal the contents of the person's mind in the way that disclosure of a pass code would or in the way that disclosure of a cryptography key to decrypt encrypted data would compel someone to reveal a specific pass code or to reveal information on how to decrypt data is compelling testimony from that person. But obtaining information from a person's mind is not what happens when agents pick a finger to apply to the sensor under the screen of a cellphone." Regardless of any testimonial component of a suspect being compelled to provide a passcode, defendant's provision of his fingerprint did not require him to divulge the contents of his mind under the facts of this case.

Defendant's act of producing his fingerprint to unlock his phone did not constitute testimonial evidence under the facts of this case, as nothing about the act of providing his fingerprint called for defendant to utilize or disclose the contents of his mind. "[T]he privilege against self-incrimination is limited to the involuntary giving of testimonial or communicative evidence. It does not extend, as here, to 'real or physical' evidence extracted under compulsion. [Citations.]" (*People v. Scott* (1978) 21 Cal.3d 284, 291.) Even if defendant engaged in some marginal implicit communication by providing his fingerprint to unlock his phone, the fact that defendant had access to and control over the phone at issue was a foregone conclusion. Because defendant's act was non-testimonial, no concern regarding compulsory self-incrimination is present. Therefore, the trial court did not err in denying defendant's motion to suppress on this basis. (*Doe*, *supra*, 487 U.S. at p. 210.)

### C. *Use of Defendant's Finger to Unlock Phone – Due Process*

Defendant next contends that the compelled use of his fingerprint to unlock the phone violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and under article I, section 7 of the California Constitution. He argues: "[W]here Gonzalez grabbed [defendant's] hand and forced his finger onto his phone, while [defendant] objected and asked for an attorney, [defendant's] will was overcome. His testimony, resulting from him opening the phone, that he had previously accessed the phone and had some level of control over the phone and its contents, was not voluntary. Additionally, [defendant] was told by the officers that they were 'going to get your thumbprint on that phone whether you like it or not,' and that he could 'do it and get it over with' or 'it's not going to be fun.' [Citation.] These threats also had the effect of rendering [defendant's] testimony involuntary. As a result, defendant's right to due process was violated when the officers forced the use of his biometric data." We find no due process violation in the actions of Gonzalez and other law enforcement officials.

### 1. **Legal Principles and Standard of Review**

"An involuntary confession . . . is inadmissible under the due process clauses of both the Fourteenth Amendment [citation] and article I, sections 7 and 15 [of the California Constitution] [citations]." (*People v. Benson* (1990) 52 Cal.3d 754, 778.) "Involuntary statements to police are inadmissible for all purposes. [Citation.] Statements are involuntary when they are not the product of ' " 'a rational intellect and free will.' " ' [Citations.] To use a defendant's statements to police at trial, the prosecutor must prove by a preponderance of the evidence that they were voluntary. [Citation.] On appeal, the voluntariness of the statements 'is reviewed independently in light of the record in its entirety, including "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." ' [Citation.] We ' " 'examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden.' " ' [Citation.]"

(*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 20.) " '[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" . . . .' [Citation.]" (*Ibid.*) "If coercive police conduct is present, we evaluate the totality of the circumstances to determine whether a defendant's statements were freely given. [Citation.]" (*Ibid.*)

### 2. Analysis

At trial, defendant's motion to suppress asserted that compelling him to provide his finger to unlock the phone violated his due process rights because his "will was overborne by the use of physical force" to unlock the phone. His motion asserted: "Physical force was used in this case to overbear [defendant's] will and elicit an incriminating statement. In the present case Detective Gonzalez literally grabbed [defendant's] hands and fingers against his will and forced his hand onto the phone, while [defendant] repeatedly objected and requested an attorney. As such, any and all statements elicited therefrom and the fruits of search of the cellphone that followed must be suppressed on state and federal Due Process grounds."

The trial court denied this aspect of the motion to suppress, concluding: "Here the force used was grabbing the defendant's hand and applying each finger to the sensor on the cellphone screen. [¶] The force used in applying the defendant's fingers to the cellphone was reasonable. The defendant was not restrained and he was not forced to experience any forceful control holds to gain compliance. [¶] [Defendant] slightly pulled his hand back. Detective Gonzalez asked him to not pull away. [Defendant] subsequently complied. [¶] [Defendant] was ordered a second time to give the officers his hand again. Then Detective Gonzalez guided the defendant's fingers to the phone one by one. [¶] Nothing in the -- nothing that the officers did resulted in any injury to [defendant]." The trial court ruled that detectives used "minimal" force to secure defendant's fingerprint, that they did not threaten defendant's health or safety, that they

36

did not use deception, and that any affront to defendant's privacy was minimal when compared other permissible uses of force such as bodily intrusion searches.

Defendant's due process argument relies on his assertion that his act of placing his finger on the phone constituted a testimonial act, an assertion we have already rejected in defendant's claim of compulsory self-incrimination. The basis for his due process argument is that his "testimony, resulting from him opening the phone, that he had previously accessed the phone and had some level of control over the phone and its contents, was not voluntary." However, the only testimony defendant identifies in his act of placing his finger on the phone consists of an acknowledgement that he had access to and ownership of the phone. This was not disputed, and the prosecution introduced no evidence and made no argument at trial that defendant's act of unlocking the phone demonstrated his access to or control over the phone. In fact, Gonzalez did not even explicitly mention in his testimony at trial that defendant's finger unlocked the phone. Thus, even if defendant's act of unlocking the phone with his finger had some testimonial aspect, any such testimony or confession was not introduced at trial.

In addition, as the trial court noted, even though defendant's act of placing the finger on the phone was not voluntary, the physical force Gonzalez used to effect the unlocking of the phone was minimal and reasonable. In performing a search or seizure of a person, law enforcement "may not use unreasonable force to perform a search or seizure of a person." (*People v. Rossetti* (2014) 230 Cal.App.4th 1070, 1078.) While defendant objected to the use of his fingerprint, the only actual force Gonzalez used was to take defendant's hand and move it to the phone. As the trial court stated, a due process violation does not necessarily occur when law enforcement effects a compulsory blood draw from a suspect. (*Schmerber*, *supra*, 384 U.S. at p. 760.) "Law enforcement must act reasonably and use only that degree of force which is necessary to overcome a defendant's resistance in taking a blood sample. Even where necessary to obtain a blood sample police may not act in a manner which will 'shock the conscience.' " (*Carleton v.*

37

*Superior Court* (1985) 170 Cal.App.3d 1182, 1187–1188, fn. omitted.) Placing defendant's finger against his phone was less intrusive than a compulsory blood draw, and defendant points to no evidence that indicates law enforcement's actions in guiding his finger to the phone shocks the conscience or constituted force beyond that which was necessary to overcome defendant's resistance. Thus, we see no due process violation in the actions by law enforcement to compel defendant to provide his fingerprint to unlock the phone.

### D. Use of Defendant's Finger to Unlock Phone – Ineffective Assistance of Counsel

Finally on the issue of the use of defendant's finger to unlock his phone, defendant contends that "defense counsel failed to argue specifically why the contents of [defendant's] phone and his testimony in opening the phone should have been excluded due to violations of the Fourth and Fifth Amendment and his right to due process." Relatedly, defendant asserts that his trial counsel failed to cite cases that supported his argument that the act of producing his finger to unlock the phone constituted compelled self-incrimination. Thus, he asserts that he received constitutionally ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim, a criminal defendant must establish both that his or her counsel's performance was deficient and that the deficient performance prejudiced the defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

38

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) "[W]e begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, we have characterized [a] defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission. [Citation.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).)

Regarding prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) "A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' [Citations.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 (*Fairbank*).)

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of

an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)

Defendant's trial counsel fully briefed and argued to the trial court the issues concerning the use of defendant's finger to unlock the phone. Trial counsel asserted to the trial court that the compelled use of defendant's finger to unlock the phone constituted violations of the Fourth Amendment, the privilege against self-incrimination, and defendant's right to due process. Defendant has had the opportunity to fully raise these issues to this court. We have reviewed defendant's issues concerning the accessing of his cell phone and have concluded that the trial court did not err in denying defendant's motion to suppress the evidence recovered from the phone. Because of this, defendant cannot show that but for any errors made by his trial counsel, the result of his proceedings would have been different. Defendant cannot demonstrate prejudice, and as a result, his claim of ineffective assistance of counsel fails. (*Strickland*, *supra*, 466 U.S. at p. 694.)

### E. *Expert Testimony on Behavior by Child Sexual Abuse Victims*

In discussing the parties' motions concerning testimony by Dr. Urquiza, the prosecution's expert on the psychological effects of child sexual abuse, the prosecutor asserted: "[W]e are asking to present the testimony not for the purposes of establishing a child abuse accommodation syndrome, but simply to dispel some of the myths and misconceptions regarding how victims of sexual assault typically -- how children victims of sexual assault react upon being assaulted." The prosecutor then identified several misconceptions that the prosecution expert would dispel, misconceptions the prosecutor asserted would be relevant as to Jane Does 1 through 4. In response, defense counsel acknowledged that the type of testimony the prosecutor referred to was generally admissible, and defense counsel noted that the prosecution's expert was not going to testify as to the facts of this case, so defense counsel asked the trial court to limit testimony to the areas the prosecutor identified and to provide a limiting instruction.

The trial court asked defense counsel to clarify whether he had any objection to the expert concerning the areas the prosecutor identified, and defense counsel confirmed he did not, stating: "I believe both based on my legal research and understanding of the law that those matters are permitted by case law in the State of California." The trial court agreed that the expert could testify to the matters the prosecutor identified, ruling: "[E]vidence about the victim's behavior and disabusing the myths that are associated with those particular myths that have just been addressed here specifically on the record will be permitted in the People's case-in-chief if the victim's credibility is placed in issue due to the paradoxical behavior."

At the conclusion of defendant's trial, the defense moved for a new trial based on the admission of Dr. Urquiza's testimony. Defense counsel acknowledged that Dr. Urquiza "was permitted to testify in, admittedly, a limited fashion." However, defense counsel asserted that Dr. Urquiza's testimony "in a practical sense tends to be vouching for the credibility of witnesses." The prosecution responded that Dr. Urquiza's testimony was limited and Dr. Urquiza did not "vouch for any of the credibility of the witnesses." The trial court denied defendant's request for a new trial in this regard, identifying several misconceptions about how a child might react to sexual abuse that Dr. Urquiza's testimony helped to dispel. The trial court observed: "Dr. Urquiza did not render an opinion of whether a molestation occurred. During his testimony, he made it clear that he was not expressing any opinion concerning the specific events in the case." The trial court also noted that it instructed the jury to consider Dr. Urquiza's testimony only for the limited purpose of deciding whether the conduct of Jane Does 1 through 4 was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony.

On appeal, defendant contends that the trial court abused its discretion in admitting Dr. Urquiza's testimony because the testimony constituted child sexual abuse accommodation syndrome (CSAAS) evidence, evidence defendant asserts "cannot

41

possibly be limited to dispelling myths surrounding child sexual abuse." Defendant asserts that "the jury cannot possibly avoid using CSAAS to support whatever version of events the victim in any given case describes," because "[u]nder CSAAS, any conceivable behavior is a behavior consistent with a child abuse victim." Thus, he argues, "in every case, the jury will only use CSAAS testimony as evidence that the victim's allegations must be true and that the defendant must be guilty."

### 1. Legal Principles and Standard of Review

Expert opinion testimony is admissible when the subject matter is "beyond common experience" and the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) " 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 426 (*McDowell*).)

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. [Citations.]" (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) CSAAS evidence "is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*Ibid.*) CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to

42

rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident -- e.g., a delay in reporting -- is inconsistent with his or her testimony claiming molestation.  [Citations.]  'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301, fn. omitted (*McAlpin*).)

### 2.  Analysis

Dr. Urquiza did not use the term "child sexual abuse accommodation syndrome" or "CSAAS" in his testimony.  However, we assume without deciding for the purposes of this analysis that because Dr. Urquiza's testimony was focused on dispelling myths or misconceptions about how child sexual abuse victims might be expected to act, his testimony was equivalent to CSAAS evidence.

The trial court determined Dr. Urquiza's testimony was relevant to the extent the victims' credibility was placed at issue.  Defendant does not specifically challenge the trial court's ruling in this regard, and we find no abuse of discretion in this ruling. Dr. Urquiza's testimony provided relevant evidence to the jury in deciding whether each girl's conduct was inconsistent with the conduct of someone who had been molested.  For example, Dr. Urquiza testified about how victims of child sexual abuse react in various ways, how victims of child sexual abuse might not hate their abusers or might even seek them out, how child sexual abuse victims develop coping mechanisms to manage their feelings, how victims of child sexual abuse can delay disclosure of the abuse or disclose the abuse incrementally, and how such victims can have difficulty remembering details about the abuse.  Therefore, the trial court did not abuse its discretion in concluding that the testimony involved a matter "beyond common experience" that would assist the jury. (Evid. Code, § 801, subd. (a).)

43

Defendant argues that CSAAS evidence should be generally inadmissible because it is unreliable and because, by its very nature, CSAAS evidence will always support the conclusion that abuse occurred because it suggests that both intuitive and counterintuitive behavior support an alleged victim's credibility. He asserts that while "California has accepted the admissibility of CSAAS evidence, courts have acknowledged the inherent problems with such evidence," citing cases largely from other jurisdictions. Defendant acknowledges that in *McAlpin*, the California Supreme Court held that CSAAS evidence could assist jurors by dispelling common misperceptions about victim behavior, and that this court is bound by the decisions of our Supreme Court. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1302.) However, defendant argues that *McAlpin* is "no longer an accurate reflection of current understandings of how children respond to abuse," and that recent decisions from Courts of Appeal in this state applying *McAlpin* were wrongly decided. Defendant asserts that jurors are no longer likely to hold the misconceptions that CSAAS evidence addresses, and that the admission of CSAAS evidence deprived him of due process by permitting the jury to infer that Jane Does 1 through 4 were credible witnesses.

Our Supreme Court indicated in *McAlpin* that CSAAS expert testimony is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse victims' behavior and to explain seemingly contradictory behavior of a child sexual abuse victim. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1302.) The California Supreme Court's decisions are binding on all lower courts in this state. (*People v. Johnson* (2012) 53 Cal.4th 519, 527–528 (*Johnson*).) "CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision." (*People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*).) "Further, reviewing courts have routinely held the admission of CSAAS evidence does not violate due process. [Citations.]" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174.) Defendant's references to decisions from other jurisdictions that reached a different position do not affect the binding nature of the *McAlpin* decision.

44

The *McAlpin* decision "is binding on all lower courts in this state. [Citation.] That other jurisdictions may disagree with it does not change its impact on California cases. [Citation.]" (*Munch*, *supra*, at p. 468.) Accordingly, we adhere to precedent from our Supreme Court that CSAAS evidence is generally admissible for the limited purposes for which it was admitted in the instant case. We therefore find no abuse of discretion in the trial court's admission of this evidence.[3] (*McDowell*, *supra*, 54 Cal.4th at p. 426.)

Even if the trial court should have excluded Dr. Urquiza's testimony, defendant was not prejudiced by the admission of the evidence. Jane Doe 1 timely reported the abuse, and her testimony was corroborated by the discovery of videos on defendant's phone documenting the abuse. Jane Does 2 through 4 provided testimony that demonstrated common themes about defendant's pattern of abuse, with each detailing similar types of abuse that defendant committed upon them during similar time frames at the same location. The prosecution also argued that defendant's reaction to the mother of Jane Does 2 through 4 – in which he asked which girl reported him, said the complaint would harm his marriage to M., and offered to move out of town if the matter was dropped – demonstrated his consciousness of guilt. The defense's cross examination of Jane Does 1 through 4 did little to discredit their testimony. The prosecutor also did not discuss Dr. Urquiza's testimony in her closing argument. The judge instructed the jury concerning the limited use for which Dr. Urquiza's testimony could be considered, and we presume the jury generally understands and follows instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) This instruction stated in relevant part: "Dr. Urquiza's testimony about the psychological effects of child sexual abuse and

---

[3] Defendant argues that the trial court's admission of Dr. Urquiza's testimony is reviewed de novo because the question presented is whether the trial court correctly construed the Evidence Code in admitting the evidence. Assuming without deciding that the de novo standard of review applies, our conclusion remains that the trial court did not err.

general myths and misconceptions is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not the conduct of Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4, was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." Dr. Urquiza also testified that his testimony solely involved dispelling any misconceptions about how victims of child sexual abuse might be expected to react, not whether abuse actually occurred in this case. In this situation, even if the trial court improperly admitted Dr. Urquiza's testimony, and even if the admission amounted to a violation of defendant's due process rights, we find beyond a reasonable doubt that any error was harmless, and thus reversal is not warranted. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

### F. Instruction Regarding Child Sexual Abuse Expert Testimony

Defendant contends that the trial court erred by using CALCRIM No. 1193 to instruct the jury regarding Dr. Urquiza's testimony.[4] Defendant argues that CALCRIM No. 1193 "does not inform the jurors that CSAAS assumes the truth of the complaining witnesses' claims. It fails to instruct the jury that the evidence is relevant only to educate the jurors about how molested children may act in general. Instead, it tells the jurors they may consider the evidence in 'evaluating [victims'] believability,' " which defendant asserts improperly invites the jury to consider CSAAS evidence to support an alleged

---

[4] In full, this instruction stated: "You have heard testimony from Dr. Anthony Urquiza regarding the psychological effects of child sexual abuse and general myths and misconceptions. [¶] Dr. Urquiza's testimony about the psychological effects of child sexual abuse and general myths and misconceptions is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not the conduct of Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4, was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

victim's allegations against a defendant. As a result, defendant asserts that the trial court erred in using CALCRIM No. 1193, and that the alleged error deprived him of his due process right under the Fourteenth Amendment to the United States Constitution.

### 1. Legal Principles and Standard of Review

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

"A jury instruction may ' "so infuse[] the trial with unfairness as to deny due process of law." ' [Citation.] However, ' "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' " ' [Citations.] ' "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." ' [Citations.] ' "If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' [Citation.]" (*People v. Lemcke* (2021) 11 Cal.5th 644, 655.)

### 2. Analysis

As with the previous issue, we assume without deciding for the purposes of this analysis that Dr. Urquiza's testimony was equivalent to CSAAS evidence.

Defendant did not object to CALCRIM No. 1193 at trial. In fact, defense counsel's trial brief listed CALCRIM No. 1193 as one of the defense's proposed instructions. At trial, defense counsel raised no objection when the trial court proposed issuing CALCRIM No. 1193. Based on this, the Attorney General urges this court to conclude that defendant has forfeited this issue. In reply, defendant asserts that "the rule of forfeiture does not apply if the instruction was an incorrect statement of the law, which is [defendant's] argument here."

We need not decide whether forfeiture applies in this case because the trial court did not err in giving CALCRIM No. 1193. The trial court did not err in instructing the jury in accordance with CALCRIM No. 1193 because it is not reasonably likely that jurors understood the instruction as permitting the use of Dr. Urquiza's testimony for the improper purpose of proving that defendant sexually abused Jane Does 1 through 4. CALCRIM No. 1193 informs jurors that they may use CSAAS evidence to evaluate whether the alleged victim's behavior, which may appear inconsistent with being molested, was actually not inconsistent with the behavior of a child sexual abuse victim. To the extent that CALCRIM No. 1193 allowed the jury to consider Dr. Urquiza's testimony in their evaluation of the believability of the testimony from Jane Does 1 through 4, the instruction is proper. CSAAS evidence is relevant and admissible when an alleged victim's credibility has been attacked. (See *McAlpin*, *supra*, 53 Cal.3d at p. 1302 [expert opinion that it is not unusual for a parent to refrain from reporting a known child molestation was "clearly relevant [citation] because it tended to rehabilitate the testimony" of the victim's mother as a corroborating witness].) The jury could use the CSAAS evidence in evaluating whether the testimony of Jane Does 1 through 4 was believable. The instruction specifically instructs the jurors that they must not consider CSAAS testimony as evidence that defendant committed the charged crimes. Thus, nothing about the language of CALCRIM No. 1193 supports defendant's argument that his due process rights were denied.

When combined with Dr. Urquiza's testimony emphasizing the limited nature of his testimony, the instruction would not cause the jury to believe that they could consider Dr. Urquiza's testimony as proof that defendant sexually abused Jane Does 1 through 4. As defendant acknowledges, the Court of Appeal in *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*) rejected a similar argument to the one defendant raises here. In *Gonzales*, the court noted that CALCRIM No. 1193 "must be understood in the context" of the expert's testimony, which in that case stressed that "CSAAS is not a tool

48

to help diagnose whether a child has actually been abused." (*Gonzales*, *supra*, at p. 503.) In this context, the court held, a reasonable juror would understand CALCRIM No. 1193 to mean that the jury could use the expert's testimony to conclude that the alleged victim's behavior "does not mean she lied when she said she was abused." (*Gonzales*, *supra*, at p. 504.) The court held that the jury would understand that it could not use the CSAAS expert's testimony to conclude that the alleged victim "was, in fact, molested." (*Ibid.*) The court concluded: "The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the alleged victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Ibid.*) Other courts have come to similar conclusions regarding CALCRIM No. 1193. (See *Lapenias, supra*, 67 Cal.App.5th at pp. 175–176; *Munch*, *supra*, 52 Cal.App.5th at p. 474.) Recently, this court also held that a trial court did not err in instructing the jury with CALCRIM No. 1193 regarding testimony from the same expert who testified in the instant case, and that there was no reasonable likelihood the jurors applied the instruction in an impermissible manner. (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 782, 816.) We follow the same approach here. Because the instruction correctly informed the jury of the permissible and impermissible uses of Dr. Urquiza's testimony, and because there is no reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted by defendant, the trial court did not err in instructing the jury with CALCRIM No. 1193, and defendant's due process right was not denied.

In addition, even if the trial court erred in instructing the jury with CALCRIM No. 1193, any such error would not constitute reversible error. The trial court instructed the jury to not use the testimony to determine whether abuse occurred. The prosecutor did not mention Dr. Urquiza's testimony in her closing argument, indicating that this

49

testimony was not a central matter in the prosecution's case. Dr. Urquiza's testimony was brief and limited, and he stressed in his testimony that he was not familiar with the facts of this case and was not expressing any view as to whether abuse occurred in this matter. The strong evidence against defendant, including the video evidence that corroborated Jane Doe 1's testimony and the similar testimony from Jane Does 2 through 4, also supports the conclusion that defendant would have been convicted of the same offenses regardless of any alleged error in the instruction. Even if the trial court erred in using CALCRIM No. 1193 and the error was of federal constitutional dimension, we find the error harmless beyond a reasonable doubt under *Chapman, supra*, 386 U.S. at page 24.

### G. *Instruction Regarding Using Evidence of Defendant's Charged Actions to Demonstrate Propensity*

Defendant next asserts that the trial court erred in instructing the jury in accordance with CALCRIM No. 1191B. Consistent with this instruction, the trial court instructed defendant's jury as follows: "The People presented evidence that the defendant committed the crimes of lewd or lascivious acts on a child under 14 years as charged in counts 1, 2, 3, 8, 9, 10, and 11. [¶] If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case. [¶] If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt." Defendant contends that the instruction is legally erroneous in allowing the jury to consider evidence of *charged* acts of sexual abuse to be used as evidence of defendant's propensity to

50

commit other charged acts of sexual abuse, and that the error prejudiced him. We do not agree.

As a preliminary matter, as with the CALCRIM No. 1193 instruction, defendant's trial brief listed CALCRIM No. 1191B as one of its proposed instructions. Defense counsel also voiced no objection when the trial court proposed issuing this instruction. However, we need not decide whether forfeiture applies here, because the trial court's instruction was not legally erroneous.

Evidence Code section 1101 provides in relevant part: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Evidence Code section 1108 provides in relevant part: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."[5] (Evid. Code, § 1108, subd. (a).)

As defendant notes, the California Supreme Court has held that Evidence Code section 1108's reference to "the defendant's commission of another sexual offense or offenses" permits the jury to consider evidence of a defendant's *charged* sexual offenses, in addition to evidence of *uncharged* sexual offenses, to demonstrate his or her propensity to commit the other charged sexual offenses. In *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), our Supreme Court held: "In short, we conclude nothing in the language of section 1108 restricts its application to uncharged offenses. Indeed, the

---

[5] Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

51

clear purpose of section 1108 is to permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses. . . . In light of this clear purpose, we perceive no reason why the Legislature would exclude charged sexual offenses from section 1108's purview, and no indication that it did so in either the text of section 1108 or its legislative history. Whether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence." (*Id.* at p. 1164.) As with defendant's earlier issue regarding admission of Dr. Urquiza's testimony, decisions by the California Supreme Court are binding on this court. (*Johnson*, *supra*, 53 Cal.4th at pp. 527–528.) Under *Villatoro*, the trial court correctly instructed the jury that if it found beyond a reasonable doubt that defendant committed one or more of the charged lewd or lascivious acts, it could conclude from that evidence that defendant was likely to commit and did commit the other sexual offenses charged in this case.

### H. Ineffective Assistance of Counsel – Failure to Object to Prosecutor's Closing Argument Regarding Lesser Offenses

Defendant next asserts that he received constitutionally ineffective assistance of counsel when his trial counsel failed to object to the prosecutor's statement during closing argument that the jury should not consider a lesser included offense until it had acquitted defendant of the charged offense. This argument stems from the prosecutor's argument to the jury as follows: "So you are going to see an instruction in the verdict forms for Counts 8 and 9. Lessers are basically if you find the defendant not guilty of Counts 8 or 9, then and only then do you consider the lesser offense." Defense counsel did not object to this statement. Counts 8 and 9 alleged defendant committed lewd acts against Jane Does 2 and 3. The trial court instructed the jury that attempted lewd acts were lesser included offenses to counts 8 and 9.[6] Defendant claims the prosecutor's

---

[6] Defendant waived the statute of limitations so the trial court could instruct the jury on these lesser included offenses to counts 8 and 9.

statement misstated the law because the statement "conflated an instruction about verdicts -- i.e., the jury cannot reach a verdict on the lesser included offense without reaching a not guilty verdict on the charged offense -- with the jury's ability to simultaneously discuss the charged offense along with the lesser included offense."

To prevail on an ineffective assistance of counsel claim, a criminal defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland*, *supra*, 466 U.S. at p. 687.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Id.* at p. 697.) Regarding prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) "A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' [Citations.]" (*Fairbank*, *supra*, 16 Cal.4th at p. 1241.)

In *People v. Kurtzman* (1988) 46 Cal.3d 322, the California Supreme Court interpreted an earlier decision from the court to "be read to authorize an instruction that the jury may not *return a verdict* on the lesser offense unless it has agreed beyond a reasonable doubt that defendant is not guilty of the greater crime charged, but it should not be interpreted to prohibit a jury from *considering* or *discussing* the lesser offenses before returning a verdict on the greater offense." (*Id.* at p. 329.) "*Kurtzman* thus affirmed the validity of an 'acquittal-first' rule—that the jury may not return a verdict on a lesser offense unless it first finds a defendant not guilty of the greater offense—but rejected a strict acquittal-first rule, applied in some states, 'under which the jury must acquit of the greater offense before even considering lesser included offenses.' [Citation.]" (*People v. Olivas* (2016) 248 Cal.App.4th 758, 773.)

Assuming without deciding that trial counsel was ineffective in failing to object to this statement by the prosecutor,[7] defendant was not prejudiced by the failure to object. Soon after the prosecutor's argument, the trial court instructed the jury in accordance with CALCRIM No. 3517 as follows: "It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime." "We of course presume 'that the jurors understand and follow the court's instructions.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Thus, the jury is presumed to have followed the trial court's instructions that the jury could determine the order in which it would consider each charged offense and the relevant evidence. Defendant was not prejudiced by any deficiency in his trial counsel's failure to object to the prosecutor's statement, and thus he is not entitled to relief on this issue.

### I. *Imposition of Fines and Fees*

The trial court imposed various fines and fees at sentencing, including a $10,000 restitution fine pursuant to section 1202.4, subdivision (b) and a suspended restitution fine in the same amount under section 1202.45, a $300 sex offender registration fine pursuant to section 290.3 plus $930 in penalty assessments, a $440 court operations assessment pursuant to section 1465.8, subdivision (a)(1), and a $330 court facilities assessment (also referred to as a criminal conviction assessment) pursuant to Government Code section 70373. Defendant did not object that he lacked the ability to pay these fines and fees, and when the trial court asked defense counsel if he wished to address anything concerning the sentence the court imposed, defense counsel replied negatively. The trial court did not explicitly conduct an assessment as to defendant's ability to pay these amounts.

---

[7] The Attorney General concedes that this statement by the prosecutor was erroneous, and that no tactical reason could account for defense counsel's failure to object to it.

54

Defendant challenges the imposition of the fines and fees listed above, asserting that imposing these fines and fees without a determination that he was able to pay these costs violated his due process rights under the United States and California Constitutions. Defendant cites *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) in support of this argument. We conclude defendant forfeited this argument by failing to object to the imposition of these fines and fees at sentencing.

In *Dueñas*, the Court of Appeal reversed an order imposing the court operations assessment and the court facilities assessment after concluding that it was "fundamentally unfair" and violated the defendant's due process rights under the federal and California Constitutions to impose these assessments without determining the defendant's ability to pay these amounts. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) The court also concluded that the execution of a restitution fine under section 1202.4 "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, at p. 1164.) At sentencing, the defendant in *Dueñas* had requested a hearing to determine her ability to pay various amounts that were imposed by the trial court, and at the separate hearing, she presented an "uncontested declaration concerning her financial circumstances." (*Id.* at p. 1163.)[8]

In general, a defendant who fails to object to the imposition of fines and fees at sentencing forfeits the right to challenge those fines and fees on appeal. (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 867; *People v. Trujillo* (2015) 60 Cal.4th 850,

---

[8] The California Supreme Court has granted review of two related issues in light of *Dueñas*: 1) Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and 2) If so, which party bears the burden of proof regarding defendant's inability to pay. (*People v. Kopp* (2019) 38 Cal.App.5th 47, 95 (*Kopp*) [citing *Dueñas* in holding that a trial court erred by not conducting an ability to pay hearing for court facilities and court operations assessments after the defendant explicitly raised the issue below], review granted Nov. 13, 2019, S257844.)

853–854.)  Following *Dueñas*, several courts have continued to apply forfeiture where a defendant fails to object to fines and fees on ability to pay grounds and the sentencing hearing was conducted after *Dueñas* was decided.  (*People v. Flowers* (2022) 81 Cal.App.5th 680, 687; *People v. Washington* (2021) 61 Cal.App.5th 776, 800; *People v. Keene* (2019) 43 Cal.App.5th 861, 864; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*).)  This court has likewise held that forfeiture applies where a defendant fails to object to the imposition of fines and fees at sentencing proceedings that took place after *Dueñas*.  (*People v. Greeley* (2021) 70 Cal.App.5th 609, 624 (*Greeley*).)

While we await the California Supreme Court's decision in *Kopp*, we need not address in this case whether *Dueñas* was correctly decided because defendant forfeited this issue by failing to object at his sentencing hearing.  Defendant's sentencing hearing took place on April 12, 2022, more than three years after *Dueñas* was decided.  Thus, "there is no reason why defendant could not have requested an ability-to-pay hearing based on *Dueñas*."  (*Greeley*, *supra*, 70 Cal.App.5th at p. 624.)  "Defendant's apparent decision to not raise the issue at the felony sentencing hearing forfeits [his] arguments on appeal."  (*Ibid.*)  Defendant's case is distinguishable from other decisions by this court where the sentencing hearings took place prior to *Dueñas*.  (See *People v. Santos* (2019) 38 Cal.App.5th 923, 932 [holding forfeiture did not apply where the defendant's sentencing hearing took place about one year before *Dueñas* was decided]; *People v. Petri* (2020) 45 Cal.App.5th 82, 88–89 [assuming without deciding that the defendant did not forfeit his due process claim under *Dueñas* where sentencing took place before the *Dueñas* decision].)

In addition, apart from *Dueñas*, the trial court imposed the maximum restitution fine of $10,000 under section 1202.4, along with a suspended parole revocation fine in equal amount under section 1202.45.  Subdivision (d) of section 1202.4 states that "the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay . . ." in setting a restitution fine above the statutory minimum.

Because the trial court imposed the maximum restitution fine (§ 1202.4, subd. (b)(1)), defendant was "obligated to object to the amount of the fine and demonstrate his inability to pay anything more than the $300 minimum. Such an objection would not have been futile under governing law at the time of his sentencing hearing. [Citations.]" (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.) In other words, "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute [citation] expressly permitted such a challenge. [Citation.]" (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.) Because defendant forfeited his objection to the $10,000 restitution fine and suspended parole revocation fine in equal amount, the forfeiture analysis applies to the other fines and fees in lesser amounts. "As a practical matter, if [defendant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding [lesser] fees." (*Ibid.*)

Defendant alleges in the alternative that he was denied his right to effective assistance of counsel by his trial counsel's failure to object to the imposition of certain fines and fees. However, where—as here—a claim of ineffective assistance of counsel is made on direct appeal, ineffective assistance of counsel will be found only if the record affirmatively demonstrates trial counsel had no rational tactical purpose for the challenged act or omission. (*Mai*, *supra*, 57 Cal.4th at p. 1009; *Mickel*, *supra,* 2 Cal.5th at p. 198.) Here, the record does not affirmatively demonstrate defendant's trial counsel had no rational tactical purpose for failing to object to the imposition of the challenged fines and fees. Defense counsel may have had access to information about defendant's financial status, including the possibility of his earnings while in prison, that would make such an objection

unsuccessful.[9] We therefore conclude that defendant has not demonstrated his trial counsel was ineffective in failing to object to the imposition of the fines and fees.

### J. Conclusion

The compelled use of defendant's fingerprint to unlock his phone did not violate defendant's Fourth Amendment right to be free from unreasonable searches and seizures because even assuming the use of his fingerprint constituted a search under the Fourth Amendment, the detective's probable cause statements seeking authority to compel defendant's fingerprint were incorporated by reference into the warrants, and thus the detective's actions in compelling defendant to provide his fingerprint to unlock the phone were not warrantless. In addition, suppression of the evidence from defendant's phone was not called for because the good faith exception to the exclusionary rule applies. Defendant's act of producing his fingerprint to unlock the phone was not testimonial and thus the privilege against compulsory self-incrimination was not violated, as defendant provided physical evidence rather than testimonial evidence. Defendant did not make use of the contents of his mind in providing his fingerprint, and any marginal testimonial component of this act concerning his access to and control over the phone was a foregone conclusion. Because defendant's act of providing his fingerprint was non-testimonial and because law enforcement used reasonable force in procuring his fingerprint, defendant's due process rights were not violated. Defendant did not receive ineffective assistance of counsel concerning the motion to suppress the results of the search of his phone, as trial counsel raised the same issues defendant raises on appeal, issues we have determined do not warrant relief.

---

[9] The probation officer's presentencing report characterized defendant's financial capability as "[l]imited," while noting defendant "will have earning potential in State Prison." The search warrants in this matter noted defendant either possessed or had access to two vehicles, a Volkswagen Beetle and a BMW X5, and that in addition to his personal cell phone, he possessed a work phone.

Even assuming forfeiture does not apply, the trial court did not err in admitting the testimony of Dr. Urquiza or in instructing the jury in accordance with CALCRIM Nos. 1193 and 1191B. Defendant did not receive constitutionally ineffective assistance of counsel based on his trial counsel's lack of objection to a statement by the prosecutor concerning lesser included offenses. Defendant forfeited any objection that the trial court erred in imposing various fines and fees, and he has not demonstrated he received constitutionally ineffective assistance of counsel based on his trial counsel's lack of objection to the imposition of these fines and fees.

## IV. DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
WILSON, J.

_____
BROMBERG, J.

*People v. Ramirez*
**H049957**

Trial Court:                                    Monterey County Superior Court
                                                Superior Court No.:  18CR008098


Trial Judge:                                    Hon. Rafael Vazquez


Attorneys for Defendant and Appellant:          Rachel Paige Varnell
Alfredo Ramirez
                                                Sixth District Appellate Program


Attorneys for Plaintiff and Respondent:         Rob Bonta
The People                                      Attorney General of California
                                                Lance E. Winters
                                                Chief Assistant Attorney General
                                                Jeffery M. Laurence
                                                Senior Assistant Attorney General
                                                Amit A. Kurlekar
                                                Deputy Attorney General
                                                David M. Baskind
                                                Deputy Attorney General

*People v. Ramirez*
**H049957**